KAREN L. LOEFFLER
United States Attorney

STEVEN E. SKROCKI
YVONNE LAMOUREUX
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: steven.skrocki@usdoj.gov
       yvonne.lamoureux@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:11-CR-00022-RJB |
| | ) | |
| Plaintiff, | ) | **UNITED STATES' SENTENCING** |
| vs. | ) | **MEMORANDUM** |
| | ) | |
| FRANCIS SCHAEFFER COX, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  SUMMARY OF SENTENCING RECOMMENDATIONS

**TERM OF IMPRISONMENT** ................................ **420 Months (35 Years)**

**SUPERVISED RELEASE** ................................................................. **5 Years**

**SPECIAL ASSESSMENT** ................................................................**$900.00**

**FORFEITURE**
**.22 Pistol and Silencer, Grenade Parts, Sten Machine Gun, 37mm
Launcher and Hornet's Nest Anti-Personnel Rounds.     (Not contested)**

**FINE** ........................................................................................**Not requested**

The United States Probation Office has prepared an extensive presentence investigation report (PSR) in this case. The United States does not dispute the factual findings or legal conclusions of the PSR and hereby incorporates the findings of fact and the conclusions of the PSR herein. It is the government's position that there exists sufficient and in many instances overwhelming evidence to support the factual findings of the PSR given the vast amount of evidence admitted during trial, the guilty verdicts returned by the jury and other evidence relied upon by the presentence report writer.

## II.     BACKGROUND AND COUNTS OF CONVICTION[1]

Defendant Schaeffer Cox was charged with co-defendants Barney and Vernon in a 16-count indictment for a variety of federal crimes. These included, but were not limited to conspiracy to murder federal officials, solicitation of a crime of violence (murder), possession of unregistered destructive devices and conspiracy to possess unregistered silencers and destructive devices. Trial was

---

[1]   The PSR appropriately includes a number of facts regarding Cox's co-defendants Barney and Vernon and actions they took during the course of the conspiracy. The government sets forth below a summary of meetings where Cox was present and participated. However, the government agrees that it is proper for the Court to take into account Cox's co-conspirator's actions at Cox's sentencing.

U.S. v. Cox                                          2
3:11-cr-00022-RJB

held between May 7, 2012 and June 18, 2012. Approximately 80 witnesses testified during the course of the trial. Despite the length of the trial, the amount of evidence, the large number of witnesses and the number of charges, jury deliberations were relatively brief which is a comment on the strength of the government's case.

From 2009 up to his arrest in March, 2011, Cox created, organized and ran a number of political and/or activist groups in the Fairbanks, Alaska area. These groups included the Alaska Peacemaker Militia (APM), the Second Amendment Task Force, and the Liberty Bell network. Cox was also involved in the Alaska Assembly Post, an alternative government association where Cox was bestowed the title of "Secretary of Defense", as well as holder of the office of "Commander in Chief" of the "several states of the United States of America." (PSR ¶21) With the exception of the Alaska Assembly Post, these groups were organized by Cox and, to a large extent, used by him to further his own personal and political goals of challenging the existing governmental and judicial structure of the State of Alaska on several fronts, including a campaign to discredit the judiciary by claims of fraud and lack of any jurisdiction, and to challenge the court's authority over him with respect to his own criminal cases. (PSR ¶¶49-50) In furthering this attack on the state's legal and law enforcement institutions, Cox went on the lecture circuit in several states, grandiosely claiming strategic successes based upon the

supposed strength of his groups in conflicts with the existing governmental structure. At the same time, Cox lectured crowds or gave interviews about his concepts of "liberty" and the right to bear arms vis a vis government regulation. During the speeches Cox expressed a clear message, that meeting government force with the force of a militia was the only way to prevail against his perceived view of government tyranny. (PSR ¶¶26, 52) On several occasions he claimed no hesitation in killing law enforcement officers who aggrieved him or who were his neighbors.

Cox's meetings with his inner circle, however, were far from the purely political speech. Given his increasing brushes with the law in 2010, Cox used the threat of his militia's power and loyalty to him to threaten and intimidate the judiciary and members of law enforcement. Cox's threats went from the subtle-- like visiting R.W. at his home on a weekend under the cover of "peace," to the overt-- direct threats to state court judges or Alaska State Troopers of the militia's power, numbers, intentions and desire to stand up for Cox in the event of his arrest--none of which he claimed he could prevent or forestall.

These actions, wherein he used the threat of his militia or threats of violence by them to insulate himself against the criminal justice system were the first not so tentative steps in Cox's plan of instituting his own form of government. And what form did this government take? Cox's form of government included his own

judiciary, his own military and his own law enforcement arm. (The APM and Cox's "County Rangers")[2] Cox, however, would not and did not wait for the electorate to vote on implementing these changes as free exercise of a public vote on the Cox form of sovereignty as this was not something Cox was interested in pursuing. (He had apparently had enough of the voting process when he lost his first and only foray into the political arena) His sovereignty movement therefore, was based on some undefined philosophy of peaceful coexistence between the "Cox system of government" and the one in place. It was not a mutually agreeable coexistence inasmuch as Cox espoused the belief that he was not subject to "man's law."

With respect to Count 12 (Conspiracy to Murder Federal Officials) and Count 16 (Solicitation to Commit a Crime of Violence) (PSR ¶40), Cox's journey began in 2009. During the fall of that year, Cox and Michael Anderson met and discussed what would happen if the government declared martial law. Cox and Anderson agreed those in the position of governmental leadership would have to be killed before "they got to us." It was during one of these conversations that Cox and Anderson agreed to the creation of a targeting list, which would contain the names of officials who would be killed when martial law took effect. (PSR ¶ 25)

---

[2] Cox even took the step of purchasing police duty belts, replete with six sets of conventional handcuffs and six sets of "thumbcuffs."

During the course of the investigation, Cox referred to the existence of a list, and Anderson's connection with it several times. Anderson testified about the list during trial, as well as his own attempts at creating a "federal hit list." Physical evidence of this plot was located during a search of Anderson's home in the form of a hand-drawn map of the Fairbanks Federal Building along with the names of federal officials. Anderson testified that Cox provided the names that he (Anderson) wrote down at a meeting with Cox at the IACC (Interior Alaska Conservative Coalition) in 2010. Cox has, at trial, and with respect to the presentence report, denied providing Anderson with the names on the list. Cox's claims are simply not credible. This is especially true given that Anderson would have no way of knowing T.B., T.S., or N.C., who were officers and employees of the Transportation Security Administration and the Department of Homeland Security Customs and Border Protection. (*See* Ex. 504-009, target list PSR ¶¶ 27-30 and 48.)[3] Cox directed Anderson to compile information regarding not only those federal officers, but also officers of the United States Marshals Service and

_____

[3] In fact, Anderson testified that Cox had him locate OCS employee W.W., which Anderson ultimately did. (*See* Exhibit 194, pgs. 41-43, and Exhibit 518, documents regarding W.W.) Exhibit 518 was located in Anderson's truck. There is no conceivable reason why Anderson would have this information other than through Cox's direction. The jury also heard testimony from R.W., T.B., M.J., W.W., N.C., and D.B. regarding their interactions with Cox, and their lack of interactions with Anderson. This testimony corroborated Anderson's testimony.

U.S. v. Cox
3:11-cr-00022-RJB

6

officers of the State of Alaska, including Alaska State Troopers and Office of Children Services (OCS).[4]

Anderson also testified that in March, 2010, after Cox had been charged with assaulting his spouse, that Cox asked him (Anderson) to remove certain items from his home. At trial, Anderson testified to observing a silencer, the Sten machine gun (which Cox previously told Anderson was fully automatic) and several grenade hulls. (PSR ¶30) These items were possessed by Cox a full year and probably more before the arrest/search warrants of March 10, 2011.

Cox's personal stash of illicit weaponry wasn't enough to turn the ship of state off its present course. To do that, Cox needed numbers. And to increase the perceived membership in the militia, so that government and to those he spoke would take him seriously, Cox inflated its membership but also held gatherings to increase the militia's members. In August, 2010, Cox held a militia commissioning ceremony at Barney's residence. At that meeting, Cox told the attendees that there was a federal assassination team out for him and his family. Ex. 1, pg. 100-02.[5] Cox also described his version of his dispute with OCS. He

---

[4] For example, Cox asked Anderson to get specific information on Alaska State Troopers R.W., B.B. and M.J.. (PSR ¶ 37) Trooper M.J.'s information later was provided to Olson from Cox on a post-it note.

[5] Unless otherwise noted, the exhibit number refers to the Trial Exhibit previously admitted in this matter. Citations to recordings played at trial also include the corresponding transcript page number.

U.S. v. Cox
3:11-cr-00022-RJB

7

accused the federal government of being behind the OCS investigation and boasted that he told a state court judge, "We don't mean any harm to anyone, but if you want a war, we've got one hell of a war with your name on it." Ex. 1, pg. 110.

In November 2010, Cox took the step of having a "security detail" available to protect him, his wife, and common law "judge" Bartell from the supposed federal assassin team. This armed and body-armor attired security detail was scheduled to protect Cox while Cox attended a proceeding in downtown Fairbanks at the Rabinowitz Courthouse on a misdemeanor weapons charge. Another detail was planned for later that evening while Cox was at an interview at KJNP television station. Both details received instructions to shoot to kill if "plainclothes" "agents" "drew down" on Cox or one of the other protectees. How the members of the security detail, none of whom had any weapons or security training were to differentiate between local, state, federal or simply citizenry during the "draw down" phase was never explained.

Cox held several meetings to organize the security teams for his court appearance and KJNP appearance. A whiteboard displaying the plans was seized during the search of Cox's residence. Ex. 148; PSR ¶ 42. Notes regarding the security detail plans were also found during the search of Cox's, Barney's and Vernon's residences. Ex. 153, 203, 446. During one of the pre-security detail briefings, Cox instructed his men that they had to be prepared to kill federal agents

and described a scenario where they would stomp the killed federal agents through the ice. (PSR ¶40)  Cox called the federal agents "soulless assassins" and said "If we kill one of them, they're not going to be missed, they're not going to come looking for you."  Ex. 3-03, pg. 48-49.  Cox also said that he had bought a "whole bunch of hornet nest grenades" to be loaded into grenade launchers, which Cox could provide to the men, and attach the grenade launchers to their rifles.  Ex. 3-03, pg. 50.

Barney was in charge of the security detail at KJNP.  (PSR ¶¶ 35, 35a, 36) Barney was armed that night with a 37mm launcher loaded with a Hornet's Nest round attached to his AR-15.  Vernon and Gary Brockman were also armed that night as part of Cox's security detail.  The security detail set up lights and established a vehicular funnel point and stopped at least one incoming vehicle while visibly armed with weapons.  Barney was set up on the perimeter, standing by a tree, and wearing body armor.  Another member was patrolling on a 4-wheeler on the property.

In December 2010, Cox, Vernon and Barney and others continued to discuss providing armed security for Cox.  Barney attempted to recruit people to be part of Cox's security detail for Cox's state court hearings.  During the course of those state court proceedings, Cox made threats to a State of Alaska judge and an Alaska State Trooper.

U.S. v. Cox
3:11-cr-00022-RJB

9

In January 2011, Cox, Barney, and the Alaska Assembly Post organized a "common law court" for the purpose of "trying" Cox for criminal violations of Alaska for which Cox had already been convicted and/or charged by the State of Alaska. Barney recruited the "jurors" for the "trial" held at Denny's. The "common law jury" unanimously "acquitted" Cox of the criminal charges. (PSR ¶56)

Cox had Vernon and Olson go to Anchorage February 4-6, 2011 to attend a convention on behalf of the Alaska Peacemaker Militia. Before Vernon and Olson left Fairbanks, Cox gave them directions regarding their trip, including to "get as many pineapple grenades as you – as you can get, because we'll just, um, thread the bottoms and stick an ALS fuse in them." Ex. 3-03, pg. 101. Cox also described how if they could get pineapple grenades with the hole in the bottom, they could tap it, put a bolt in, put gunpowder in, and put a new fuse in. Ex. 3-03, pg. 105. Cox added that he already had the new fuses. *Id*. Cox then brought up C-4 and said he knew someone who would make it for them and that he had discussed the price with him, but it would depend on the shelf life of the C-4. Ex. 3-03, pg. 105-06. Cox said it would be good to have C-4. *Id*.

Vernon and Olson traveled to Anchorage and followed Cox's direction. Immediately upon meeting Bill Fulton, Vernon inquired whether he could purchase

grenade bodies from him. During subsequent conversations that weekend, Vernon indicated that he wanted to purchase grenades, 50 grenade fuses, and a suppressor.

On February 12, 2011, Cox held a meeting at Ken Thesing's residence with Barney, Thesing, and Olson. (PSR ¶¶ 70-71, 73) Cox indicated that he was not going to appear for his next scheduled court date, February 14, 2011. Cox raised the idea of a "2-4-1" plan that if Cox or any militia members were killed then Cox and the others would kill two other people (including law enforcement and judges) in return. During this meeting, Cox said that two State court employees, Martin Guerrero and Ron Woods "need to dangle together like a windchime." Ex. 14-01, pg. 55. When Barney asked Cox whether 2-4-1 is initiated upon killing people or hauling Cox to jail, Cox responded "I believe that it is absolutely morally allowable if they were to come and arrest Ken for the three of us to go kick in the judges' door and the troopers and arrest two of them. And because it's war, it doesn't even really have to be the ones that did it. ... And it's not just a war in fact, it's a war declared by them, explicitly, without mincing any words, and so I think it's absolutely morally allowable that if they arrested Ken or arrested me, to go in and arrest two of them. ... If they kill one of us, we go kill two of them." Ex. 14-03, pg. 83-84.

Cox continued that he "would be well within my rights to go drill McConahy in the forehead and any of these people that are propagating this

Case 3:11-cr-00022-RJB    Document 550    Filed 01/02/13    Page 11 of 66

because they're posing a huge threat to my life and my family." Ex. 14-03, pg. 85.

Cox's reference to McConahy was the State court judge presiding over his pending criminal case. Cox continued on, stating that he had the moral allowance to shoot them. After Olson sought clarification, Cox said "go for the ones that are either authorized or failed to prevent." Ex. 14-03, pg. 87. Cox's rationale for that statement was "because then they'll give people pause to authorize or fail to prevent." *Id*. Cox continued, "I'd say the trooper that did it and the trooper that authorized it and the judge that authorized it. You know, it would be - kind of the top people." Ex. 14-03, pg. 87-88. Cox expressed that it's a tough issue because "it's easier to get ready to die than it is to kill." Ex. 14-03, pg. 89. Cox said that he was willing to kill. Ex. 14-03, pg. 90.

After hearing from Barney, Thesing, and Olson, Cox summarized:

All right, well, let me give you guys my thoughts. I really appreciate your thoughts on that. My thoughts on 241 is that we're not in a strong enough position to execute more than once, we're not in a strong enough position to follow through, and so at this point what we should do is do everything we can to avoid it, but that what we should do is we should bluff it for all it's worth and pray for God's protection and shielding hand and, uh, work and train and get ready to where we can turn that 241 into a real ability instead of just (inaudible).

Ex. 14-05, pg. 113. Cox and Barney then discussed next steps:

Barney:     In the meantime training up guys and (inaudible) guys through and getting them ready.

| | |
|---|---|
| Cox: | So, that we can - so that we can turn it from a bluff to a - to a - |
| Barney: | An action. |
| Cox: | Yeah, and we'll take the - we're ready - and the road I'll take is, we're ready and we could have you dead in minutes, but we are long suffering and we want to be your friends. You've got to stop pushing, we want to be at peace. We're going to continue long suffering, but not forever. |

Ex. 14-06, pg. 117-18. Barney then volunteered that they should "get those little target, bull's-eye things, you put them on the ... back windows of all the cop cars." Ex. 14-06, pg. 118. Because Cox was not going to appear for his next court hearing and they anticipated that an arrest warrant would be issued, Barney offered that Cox and his family could hide out at Barney's rental cabins. Ex. 14-06, pg. 119-20. Barney also expressed concern that law enforcement may be able to locate Cox there. Ex. 14-06, pg. 120.

At the February 12, 2011, meeting, Cox also discussed with Barney, Thesing, and Olson the grenades he currently possessed and expressed his desire to get grenades with longer delayed fuses. Ex. 14-07. Cox said, "I would like to have eight-second fuses and powder that burns fast enough to really send that shrapnel flying because we're using the two second fuses right now." Ex. 14-07, pg. 156. Similar to Cox's statements on February 4, 2011, it was clear at this point that Cox was in the market for more grenades.

U.S. v. Cox                     13
3:11-cr-00022-RJB

Later that same day, Cox provided Olson with Anderson's contact information so that Olson could get in touch with him regarding the list. Cox gave Olson a note with a name and home address of an Alaska State Trooper (M.J.) and indicated that M.J. needed to be on the target list. Cox described him as "the guy we've been having problems with." Ex. 16-03, pg. 29-30. Cox also showed Olson on a map where other Alaska State Troopers and a state court judge live. (PSR ¶ 72)

Barney attended Cox's state court hearing on February 14, 2011 to find out if an arrest warrant was issued for Cox. Judge McConahy, the same McConahy referenced by Cox at the February 12, 2011 meeting, issued an arrest warrant for Cox.

Cox, now a fugitive, moved into the Vernons' residence. Cox, Lonnie and Karen Vernon, and Olson met at the Vernons' residence on February 14 and 15, 2011. (PSR ¶¶ 76-77, 79-80) Cox and Vernon talked about ways to set up booby traps to block access to his house by law enforcement. Ex. 18-02. Cox described his vision of the plan:

| | |
|---|---|
| Cox: | It gets bloody when they've got – when we've got our crap together enough to – to make a good effort at round two. |
| Olson: | Yeah. |
| Cox: | Round one is going to be easy. Round two is where the work starts. |
| Olson: | Yeah. |

| Cox: | And we can do round one right now. I think the blood starts is when we've got – when we feel like we've got the – it starts either – at either just the point of total desperation when there's nothing else and it's just a Hail Mary before you get swallowed up alive, or when you've got the – the power to possibly prevail. |
| Olson: | Yeah. When – when they recognize the power – |
| Cox: | It's not like we're waiting for them to get bad enough. |

Ex. 19, pg. 4-5. Cox later summarized, "So, what do we do? We kill a whole butt load of them and then offer peace." Ex. 21, pg. 13. On February 15, 2011, Cox and Olson discussed a variety of firearms and scopes, and Cox corrected Olson that they were probably going to be doing their battling at houses instead of in the woods. Ex. 22-05, pg. 152.

Cox kept a number of firearms in a shed on his rental property near Bradway road in North Pole. Barney went to that shed before the KJNP security detail in November 2010 to retrieve the 37mm launcher and Hornet's Nest anti-personnel rounds he carried that night. On February 14, 2011, Vernon asked Cox whether he needed anything out of that stash out at North Pole, and said that "Coleman called me, I've got to call him back here pretty soon." Ex. 20-03, pg. 13. Cox responded that "[t]here's all kinds of goodies out there", but "just leave them there." *Id*.

On February 19, 2011, Barney hosted a meeting with Cox, the Vernons, Thesing, Barney and Olson. After the meeting, Cox and his family moved into Barney's home. Cox brought with him some of his firearms, his body armor, and CS grenades. Cox and his family continued to live at Barney's residence until the

U.S. v. Cox                                    15
3:11-cr-00022-RJB

day of arrest, March 10, 2011. At a separate meeting later on February 19, 2011 attended by Cox, Barney and Olson, there was further discussion about the 2-4-1 plan. PSR ¶ 64. Cox said "Because I'm not interested in go in and kill, you know, wicked people who deserve it and who it's - it's definitely - I mean, if we all shook hands and went out of here to go roll judges' heads, I mean, we're definitely morally justified." Ex. 24-12, pg. 329. Barney agreed. *Id*.

Regarding 2-4-1, Cox said "But I can say that I think for right now, a 241 is - is - would - would be running out ahead of the scale and sacrificing our self to no avail." Ex. 24-12, pg. 336. Barney responded that he thinks "[t]hat - that our troops - and that's the scale starting to tip, when they see more people that start to wake up and come to our aid, and even if they still have greater numbers, they'll be a point to where even with guerilla warfare and stuff like that, two for one becomes a real possibility at that point. ... Because you actually have enough people on your side that you can - you can pay 241 for a while." Ex. 24-12, pg. 337.

Cox said that his "subconscious goal was to be able - was to get prepared to execute a 241 that needed to be - I think that it needs three - three more things here." Ex. 24-12, pg. 338. Cox said one thing it needs is "more public pain." Ex. 24-12, pg. 339. Second, Cox said, "we just need more numbers." Ex. 24-12, pg. 340. Cox said "I think 241 is - is two things. We've got to be ready for it, and there has to be - I mean, not for - not the predisposition to well, I don't know -

judgment, just a few minutes (inaudible) in the - in the general. ... We've got to have those two things in order for it to work. In order for it to not strengthen the enemy. ... You got to have the numbers to sustain it and we got to have the - the pain in the general public." Ex. 24-12, pg. 340-41.

Barney then added "And - and - and even with our guys, we got to have the pain. ... And you look at our - our snitch to - when J.R. contacted him, you know, he was - he was all big talk." Ex. 24-12, pg. 341. Barney was referring to Mike Anderson and was clearly aware of what Anderson had been tasked with and what he had failed to provide to them.

Later in the conversation, Cox and Barney agreed that if the government took one of their kids, "that's a 241". Ex. 24-15, pg. 383-86. Cox later told Barney and Olson "Well, I'm not going to target women and children, but I'm not opposed to killing them either, you know. I mean, God had them kill men, women, and children." Ex. 24-16, pg. 391.

Cox also told Barney and Olson that "[t]he purpose of killing somebody is to prevent them from killing the innocent" and "I'm not against some like drastic, shocking things either, like, you know, mailing heads to people." Ex. 24-16, pg. 394. Cox then said "I don't want to gloat. Just make people suffer." Ex. 24-16, pg. 395. Cox also told Barney and Olson, "I think if you got the time and resources, you ought to give them proper burial, you know?" Ex. 24-17, pg. 398.

Cox also told Barney and Olson referring to the victims that "just for the fact that they're made in God's image, they're - they are valuable", but "that doesn't mean that I won't kill you" or "that I wouldn't hang your body from a lamppost to deter others." Ex. 24-17, pg. 399.

On February 21, 2011, Cox, Barney, and Olson went to the property off of Bradway Road owned by Cox where he had a shed containing weapons. PSR ¶ 65. While Cox spoke with his tenant on the property, Barney and Olson moved items from the shed into Barney's truck. The items included assault rifles, ammunition, and approximately 8 grenades.

On February 22, 2011, Cox, Barney and Olson met at Barney's residence. PSR ¶ 88. Barney relayed a conversation he had with an "arms dealer and explosive dealer" about a rumor eight grenades got stolen from Fort Wainwright and Cox got them. Ex. 27-01, pg. 7. Barney continued that "Me and Schaeffer were talking about it and thinking eight grenades doesn't sound like a lot unless you're one of the Judges or DAs we're looking at." Ex. 27-01, pg. 8. Barney then described a new type of body armor, dragon skin, that he was interested in getting and said that you could only get it through a dealer. Ex. 27-02. Cox told Olson that he had one fully automatic weapon and that it was a weapon that he made himself. Ex. 27-05. Cox, Barney and Olson also discussed a communication plan, a way to avoid detection by law enforcement, of using "red" phones and "yellow"

phones to speak with each other. Cox gave Olson a list of tasks for another person. One of the tasks included picking up Cox's lower receiver, which would make one of Cox's rifles fully automatic. Ex. 123.

On February 26, 2011, Cox, Barney and Olson met at Barney's residence. PSR ¶¶90-92. Olson told Barney that Vernon "was saying that - that uh, you guys might be interested in some silencers." Ex. 28-01. Barney responded "Oh, yeah. He was - he's the one that's getting them." *Id*. Olson corrected him and said "it's actually me" who's getting them. *Id*. Olson also said that he's getting them from Bill. *Id*. Olson then told Barney that Bill Fulton is a dealer, but he "just does it under the table kind of ... makes them disappear. ... loses them or however they .. however he can work his - work his books." Ex. 28-01, pg. 32. Olson told Barney and Cox that Fulton is "all gung-ho ready to come north and start the Revolution." Ex. 28-01, pg. 35. Cox responded that "we're going to have to have some pain to shut people up about their decadence." *Id*. Barney added "And then what will happen is - is the - the numbers in the militia will be just enough of a force, I think of people (inaudible) those who wanted to but didn't feel enough pain then at that point." *Id*.

Cox ordered a pistol and silencer matched set. Ex. 28-02, pg. 37-38. Cox then discussed with Barney and Olson how a silencer would work with a Glock firearm. Ex. 28-02, pg. 38-40. Cox told Barney and Olson that he "would love to

get a center fire silencer." Ex. 28-02, pg. 42. Cox also told Olson that "we just did a little tutorial yesterday on ... homemade silencer for .22s."[6] Ex. 28-03. Cox, Barney and Olson talked about subsonic ammunition. Ex. 28-03, pg. 51. Cox agreed with Olson to trade his C-93 semi-automatic rifle, with a full auto lower receiver, for the pistol/silencer matched set. Ex. 28-04. The C-93 rifle and lower receiver were with a gun shop owner, Rob Carr. Cox also described how to modify a firearm to make it fully automatic. *Id.* That same day, Barney also ordered a pistol/silencer matched set. Ex. 28-05.

Later in the conversation, Cox, Barney and Olson discussed a missing grenade launcher. Ex. 28-07. Cox asked Olson if he had gotten a grenade launcher, but Olson said he didn't see one when they moved the firearms from the Bradway Road shed. *Id.* Barney added "And I know we haven't used it on any of the little missions that we've done. The only one we used is the one with the spider on it and I had it mounted to my AR with HOV ... hornet's nest." *Id.*

On March 1, 2011, Cox, Barney and Olson met at one of Barney's rental cabins. PSR ¶¶ 93-94. During the conversation, Cox told Olson that he'd like to have some pineapple grenades. When they were discussing the price of grenades, Cox said "But, yeah, if [Bill Fulton] could come down even to I'd say anything below $70, I would be feeling like I can buy as much as I want. And if he gets it at

---

[6] Barney testified at trial that he saw Cox fire his silenced pistol from Barney's office door.

$50, I think I'd stock up."  Ex. 29-04, pg. 22.  When Cox asked Olson how much

Fulton wants for 25 grenades, Barney said "That would be $200 cash right now,

ooh."  Ex. 29-04, pg. 23.

Barney also relayed a conversation he had with a member of his church who

asked Barney "I need to know where you stand on things because he says, I don't

want my family to go through - is my family in danger?  Are your guys going to

show up at church one time?"  Ex. 29-05, pg. 27.  Cox responded to Barney "You

should ask him, well, what are you planning on doing that would make my guys

show up at your house?  You know, I'm the operations officer."  *Id*.

On March 4, 2011, Cox and Olson met at Barney's residence.  Olson

informed Cox that only eight grenades would be available for purchase from Bill

Fulton.  Ex. 30-06.  When Olson relayed that he told Fulton they wanted them, Cox

responded "Yeah and as many more as you can get."  *Id*.

On March 7, 2011, Cox, Barney and Olson met at Barney's residence.  Cox

and Olson then went to a local gun dealer to retrieve the lower receiver which Cox

had agreed to trade for the pistol/silencer matched set.  They obtained the lower

receiver.  (PSR ¶ 100)  Cox and Olson then drove around looking for Anderson in

order to obtain the list information from him, but were unsuccessful in contacting

Anderson.

On March 8, 2011, Cox and Olson spoke on the phone and Cox relayed that he met with Anderson and was not able to get the target list information from him. Ex. 32-01. Cox described Anderson as "pretty chickened out." *Id*. Cox said "it's not like he got a monopoly or anything that can't be achieved the same way ... we can go about it another way." *Id*.

On March 9, 2011, Barney spoke on the phone with Olson. PSR ¶ 103. Olson told Barney that "everything's a go" and "we've got - got that equipment in". Ex. 35, pg. 3. They set a time to meet the following morning so that Barney "can be there and - and check this stuff out and what not." Ex. 35, pg. 4. Olson later added "And we can meet - we'll meet up with Hans (phonetic) too at the - at the same time." Ex. 35, pg. 5.

On March 10, 2011, Cox and Olson spoke on the phone about meeting up later that day. Cox asked Olson about the "guy with the can goods and the produce" and asked Olson, "you've got the cans and the produce?" Ex. 37, pg. 3-4. Olson testified that Cox was referring to the silencers and grenades.

On March 10, 2011, Cox and Barney met Olson and rode with him in his vehicle to a location where they were supposed to complete the deal to buy the pistol/silencer matched sets and grenades. PSR ¶¶ 107-108. Seconds after Cox and Barney got into Olson's vehicle, Olson told them that he "stashed the goodies" and that what Fulton got them was matched sets of .22s instead of the XDs they

ordered.  Ex. 38-01, pg. 4.  Cox's response was "Well, that's gay.  I have a

silenced .22."  Ex. 38-01, pg. 5.  Olson also told Cox and Barney that Fulton did

have grenades and they cost $50 each.  Ex. 38-01, pg. 6.  Olson added that the

grenades are "the real military legit straight from - straight from the Army."  *Id*.

Barney responded, "That's still cool."  *Id*.

      Cox, Barney and Olson then had the following conversation about silenced

.22s:

| | |
|---|---|
| Olson: | Because of the , uh - because of the silencers. They, uh - I guess they go (inaudible) they'll go - these ones here will go 200 rounds, these .22s, before you have to touch anything to the oil. |
| Barney: | Well, we can go light. |
| Olson: | (Laughter) Yeah. |
| Barney: | Go light and quiet. |
| Olson: | Well, the thing with a silencer is you're - you're close range, anyway. |
| Barney: | Yeah. |
| Olson: | You know? |
| Cox: | But see, .22s, even at close range, they take a long time to die. |

Ex. 38-02, pg. 2-3.

      Cox, Barney and Olson then discussed subsonic ammunition, and Barney

asked "How are they for devastation?  Pretty good?"  Ex. 38-02, pg. 4.  Barney

also asked whether the silencer "would go on my, uh, my .57 by .28?"  Ex. 38-02,

pg. 6.  Cox asked Olson whether he ordered the XD .9 mil pistol/silencer matched

U.S. v. Cox                                              23
3:11-cr-00022-RJB

sets, and Olson said "they're 10 to 12 months out because the dealer has to lose them."  Ex. 38-02, pg. 6.  Barney responded, "Well, let's get him on the.." and Cox added "Yeah, see if they're coming."  *Id.*  Barney also asked if Olson "could talk to [Fulton] about if you can get anything for, like, a .223, as well, or a 5-by-6."  *Id.*  Still on the topic of silencers, Cox, Barney, and Olson had the following conversation:

| | |
|---|---|
| Olson: | But in the way - the way I look at it, for me personally, anything silent like this I'm, you know, I'm prepared to - to take it. |
| Barney: | Well, it - it keeps the element of surprise. |
| Olson: | Yeah. |
| Cox: | Yeah, well, the element of surprise is something in you, even if it's not so - not, uh, silencer, then you're going to be surprised.  It's the element of escape - |
| Olson: | Yeah. |
| Barney: | Yeah, but how - how deep can you get in with the element of surprise, I should say. |
| Cox: | Yeah, because - |
| Barney: | Rather than there just be initial contact. |

Ex. 38-02, pg. 7-8.

Olson asked whether "homemade ones" work, and Cox asked him to clarify whether he was talking about grenades or silencers.  Ex. 38-02, pg. 8-9.  When Olson responded that he was asking about a silencer, Cox said that they work, and

Case 3:11-cr-00022-RJB     Document 550     Filed 01/02/13     Page 24 of 66

they're reliable and dependable.  Ex. 38-02, pg. 8-9.  Regarding homemade

silencers, Cox, Barney, and Olson had the following exchange:

| | |
|---|---|
| Cox: | Have you seen mine? |
| Olson: | No.  Uh-uh.  No, you never did show me.  You were telling me - remember it was packed away. |
| Barney: | It's pretty - it's pretty quiet. |
| Olson: | Is it? |
| Cox: | Super quiet. |
| Barney: | I mean, how many can you get off before you to refill it?  Like, two or three? |
| Cox: | Uh, well, a couple - a couple magazines.  You could probably do 20 rounds before you start to hear a difference. |

Ex. 38-02, pg. 9-10.

When they arrived at the location, Olson got out of his vehicle, retrieved the

pistol/silencer matched sets and grenades, and brought them back into the vehicle,

and handed the pistol/silencer matched sets to Cox and Barney.  Cox and Barney

opened the cases and examined the pistol/silencer matched sets.  Cox examined a

grenade.  Barney got a phone call, but after he got off the phone, Olson handed

Barney a grenade.  While Cox and Barney were examining the items, an innocent

citizen approached Olson's vehicle and asked them what they were doing.

Because the situation was compromised, Cox and Barney were immediately

arrested.  Both Cox and Barney were wearing body armor at the time they were

arrested.  In addition, Cox was carrying a firearm on his person and Barney was

carrying two firearms on his person.  Barney also had $5,000 cash on his person.

The same day as the arrests, law enforcement executed federal and state

search warrants on the defendants' residences and vehicles, together with the

residences and vehicles belonging to Anderson and Thesing.  Some of the items

found in Cox's residence include the white dry erase board with the KJNP

operations plan, a dvd of a silencer video, cds regarding converting firearms to

fully automatic and silencers, police equipment, gas masks, thumb cuffs, and

numerous documents.  Some of the items found in Barney's residence, where Cox

had been staying, included cash, computers, phones, a box containing 37mm

launcher and projectile components, firearms, ammunition, earpieces, tactical vest

with CS canisters, ballistic vest, box containing two pulled pins and two

unattached spoons/handles from practice grenades, and numerous documents.  In

his truck, Barney had phones identified as "yellow" phones and a note pad with a

list of red, yellow and green phone numbers.  Barney's and Cox's "red" phones

were seized from their persons at the time of arrest.

Forensic examinations of the computers used by Cox and Barney revealed

internet searches for "ammonium nitrate bomb" and "tannerite", a Google map

search for "Alaska judge Michael P. McConahy," and a document listing 17 Acts

of War (hard copies of which were found in Cox's residence and the trailer).  Texts

on Cox's iPhone included texts about security details, police duty belts, machine guns, and hornets nests. Ex. 792. Cox's iPhone also had a note titled "Idears to do" which included a number of items such as "Hit list." Ex. 794, 800.

Law enforcement also searched Barney's trailer, where Cox had been storing some of his belongings since mid-February 2011. In the trailer there were two 37mm launchers, four Hornet's Nest anti-personnel rounds, four live smoke grenade fuses with bodies, 17 grenade bodies, ammunition, tannerite, smokeless powder, JB weld, firearms (including .30 caliber Browning with crank-operated firing mechanism and tripod), Sten machinegun, Sten manual, silenced pistol, gas mask, police belt, and tactical scopes.

The jury also heard portions of Cox's post-arrest interview. For example, they heard Cox's statement that when he referred to "cans" and "produce" in recorded calls and texts that he was referring to freeze dried food behind his house, not silencers and pineapple grenades. Ex. 41-11. During his post-arrest interview, Cox denied knowing what a hornet's nest was. Ex. 41-12. Cox also said that he didn't recall tasking Vernon and Olson to try to obtain pineapple bodies when they went to Anchorage. Ex. 43-01. Throughout the post-arrest interview, Cox said that grenades scare him and they're "not something I would feel comfortable in my possession." Ex. 43-01, 43-05. Cox did admit that he had talked about going down south and once his family was safe, coming back and waging guerilla

warfare.  Ex. 43-03.  When asked about the trailer, Cox said he didn't know if it was Barney's trailer and "would only be speculating" regarding where Cox and Barney had parked it earlier that day.  Ex. 44-01.

As to the trial, defendant Cox stands convicted of Counts 1 (Conspiracy to Possess Unregistered Silencers and Destructive Devices, in violation of 18 U.S. C. Section 371), 2 (Possession of Unregistered Destructive Devices, in violation of 26 U.S.C. Section 5861(d) and 5871), 3 (Possession of an Unregistered Silencer, in violation of 26 U.S.C. Section 5861(d) and 5871), 4 (Possession of an Unregistered Machine Gun, in violation of 26 U.S.C. Section 5861(d) and 5871), 5 (Illegal Possession of Machine Gun, in violation of 18 U.S.C. Section 922(o) and 924(a)(2), 6 (Making of a Silencer, in violation of 26 U.S.C. Section 5861(f) and 5871), 10 (Possession of Unregistered Destructive Devices, in violation of 26 U.S.C. Section 5861(d) and 5871), 12 (Conspiracy to Murder Officers and Employees of the United States, in violation of 18 U.S.C. Section 1117 and 1114), and 16 (Solicitation of Others to Engage in the Murder of an Officer of the United States, in violation of 18 U.S.C. Section 373) of the Third Superseding Indictment. Cox was acquitted of the 18 U.S.C. Section 924(c) charges set forth in Counts 7 and 15.

Defendant Barney was convicted of Counts 1 and 9 and acquitted of Counts 2, 8, 11, and 13.  The jury hung as to Barney on Count 12, Conspiracy to Murder

Federal Officials. The Court declared a mistrial as to Count 12 against Barney and the government subsequently moved to dismiss Count 12 as against Barney, which the Court granted.

Defendant Vernon was convicted of Counts 1 and 12 and acquitted of Count 14. Vernon's sentencing is set for January 7, 2013, the day before the present matter. Barney's sentencing occurred in September 2012.

## III. GUIDELINE APPLICATIONS

The PSR calculated two sets of offense levels, one for Cox's convictions of Counts 1, 2, 3, 4, 5, 6, and 10 and one for Cox's convictions of Counts 12 and 16. The adjusted offense level for the former is 36 and the adjusted offense level for the latter is 49. The United States agrees with the calculations resulting in both adjusted offense levels. Because the adjusted offense level for Cox's convictions for Counts 12 and 16 drive the applicable guidelines range, the United States addresses below only the calculations for Counts 12 and 16. To the extent that Cox objects to the offense level calculation for Counts 1, 2, 3, 4, 5, 6, and 10, the United States is prepared to respond to those objections at the sentencing hearing.

### A. Base Offense Level

The PSR found that the defendant's conduct for Counts 12 and 16 has a base offense level of 33 under U.S.S.G. § 2A1.5(a). PSR ¶ 141. This base offense level is not contested by the parties.

U.S. v. Cox                    29
3:11-cr-00022-RJB

**B.**     **Victim Related Adjustment: Official Victim, U.S.S.G. § 3A1.2(b)**

The PSR correctly found that the defendant is subject to a six-level

enhancement under U.S.S.G. § 3A1.2(b).  PSR ¶ 142.  Cox objects to this

enhancement because "the status of the intended victims as to counts 12 and 16 are

already taken into account in the base offense level" and amounts to impermissible

double counting.  These arguments not only contradict the plain language of the

guidelines, but also previously have been rejected by courts applying both

U.S.S.G. §§ 2A1.5 and 3A1.2.

The base offense level of 33 under U.S.S.G. § 2A1.5 applies for a conviction

under a number of statutes, including 18 U.S.C. §§ 373 and 1117.  A conviction

under 18 U.S.C. § 373 does not necessarily involve a victim who is a federal

officer or employee.  Yet, the base offense level of 33 would still apply.  There is

nothing in the plain language of U.S.S.G. § 2A1.5 indicating that it only applies to

crimes against federal officers or employees.

Under the Guidelines, after the base offense level is calculated in Chapter

Two, adjustments are applied as set forth in Chapter Three.  U.S.S.G. § 3A1.2

provides, in relevant part:

> (a) If (1) the victim was (A) a government officer or employee; (B) a former
>
> government officer or employee; or (C) a member of the immediate

family of a person described in subdivision (A) or (B); and (2) the

offense of conviction was motivated by such status, increase by 3 levels.

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two

guideline is from Chapter Two, Part A (Offenses Against the Person),

increase by 6 levels.

Application Note 2, *Nonapplicability in Case of Incorporation of Factor in Chapter Two*, provides: "Do not apply this adjustment if the offense guideline specifically incorporates this factor. The only offense guideline in Chapter Two that specifically incorporates this factor is § 2A2.4 (Obstructing or Impeding Officers)."

The six-level enhancement under U.S.S.G. § 3A1.2(b) is warranted because the victims were government officers and employees, the offenses of conviction were motivated by their status, and the applicable Chapter Two guideline, 2A1.5, falls within Part A. Moreover, Application Note 2 indicates that the adjustment applies here because § 2A1.5 does not specifically incorporate this factor. This interpretation is consistent with the caselaw applying these Guidelines sections. *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 151-55 (2d Cir. 2008) (upholding application of base offense level under § 2A1.5 plus enhancements under §§ 3A1.1, 3A1.2, 3A1.4, 3B1.1, and 3C1.1, and rejecting arguments that the enhancements were double counting and were expressly

U.S. v. Cox                                    31
3:11-cr-00022-RJB

accounted for in the offenses of conviction); *United States v. Hale*, 448 F.3d 971, 981, 988-89 (7th Cir. 2006) (affirming sentence where guidelines application included base offense level under § 2A1.5 and enhancements under §§ 3A1.2, 3A1.4, and 3C1.1); *United States v. Talley*, 164 F.3d 989, 1003-04 (6th Cir. 1999) (holding that "official victim" enhancement under § 3A1.2 does not constitute double counting even though the underlying offense was soliciting the murder of a federal agent in violation of 18 U.S.C. § 1114 because the base offense level under § 2A1.5 does not account for victim being a governmental official) (*citing United States v. Fann*, 41 F.3d 1218, 1218 (8th Cir. 1994) and *United States v. Woody*, 55 F.3d 1257, 1274 (7th Cir. 1995)).  Thus, the enhancement applies here.

### C.    Aggravating Role: U.S.S.G. § 3B1.1

The PSR correctly found that the defendant is subject to an aggravating role adjustment of four levels based on his leadership role in directing Anderson to develop a target list, surveillance of targets, directing Vernon to travel to Anchorage for grenades, directing Barney to unload the Bradway shed, along with directing Thesing and Brockman during the security detail at KJNP.  PSR ¶ 143. Cox objects to the application of this adjustment.

Under U.S.S.G. § 3B1.1(a), a four-level adjustment is warranted if the defendant was an organizer or leader and the criminal activity involved five or more participants or was otherwise extensive.  The evidence at trial establishes that

U.S. v. Cox
3:11-cr-00022-RJB

32

Cox was the direct leader of virtually every activity presented at trial. Without his direction, no security detail would have occurred or been necessary. Barney led the detail, at Cox's direction. The individuals to be "protected" by the security detail were Cox, Cox's wife, and "Judge" Bartell. Ex. 148 (dry erase board showing Security Team directions). The notes from the security team briefing show that they had an extensive plan, all circulating around Cox. Ex. 153, pg. 3 (notes from Cox's residence); Ex. 203, pg. 8 (notes from Barney's residence); Ex. 446, pg. 10 (notes from Vernon's residence). At one of the pre-security briefings held by Cox at his house, Cox told the security team members that they needed to be "guys who are – who've come to terms with the fact that if somebody shows up at the TV station, because it's an hour long and it's live – to try to kill Judge Bartel or Marti, you might have to kill him." Ex. 2-03, pg. 49-50. The testimony at trial by Gary Brockman and Coleman Barney establishes that there were at least four individuals outside KJNP performing the various security functions. Barney testified at his bail hearing that there were "probably five people" with him on the security detail. Ex. 52-02. Ken Thesing, while inside KJNP with Cox, Cox's wife, and "Judge" Bartell during the interview, was still part of the security detail that night. Thesing was there to protect Cox, Cox's wife, and "Judge" Bartell. Thesing was outside for at least part of the time because the photo of Vernon and Brockman that night was found on Thesing's computer. Ex. 811; trial testimony of AST

Ramin Dunford and Gary Brockman.  Because Thesing was also part of the security team that night, there were at least five participants.  Based on this alone a four-level enhancement is appropriate.

However, numerous other facts listed in the PSR and at paragraph 143 concerning Cox's direction of Anderson, Barney and others also warrant application of an aggravating role adjustment.  For example, Cox led the 2-4-1 conversations, he used Barney's and Vernon's homes as hideouts while he strategized about next steps to take, he held numerous meetings at various locations to organize Barney, Thesing, and Lonnie and Karen Vernon, he directed Anderson to compile personal information about federal officers and employees, and he directed Vernon to purchase grenades (which Cox, Barney and Vernon planned to use on government officers and employees).  The evidence at trial, particularly the recordings, clearly establish Cox's leadership role warranting the four-level adjustment.

D.  **Adjustment for Use of Body Armor in Crime of Violence: U.S.S.G. § 3B1.5**

The PSR correctly found that the defendant is subject to a four-level upward adjustment because he used body armor during the commission of the offenses, which were crimes of violence.  PSR ¶ 144.  Cox objects to application of this adjustment.  The Court found this enhancement applicable to Coleman Barney.

U.S. v. Cox                                       34
3:11-cr-00022-RJB

Given that finding, there is no reason not to increase Cox's offense level by four levels for his use of body armor during the offenses.

Count 12 charged Cox with Conspiracy to Murder Federal Officers and Employees between August 2009 and March 10, 2011. Cox wore body armor during the commission of and in preparation for Count 12, which is a crime of violence. On March 10, 2011, Cox and Barney were arrested wearing body armor and carrying two loaded guns while at an illegal weapons sale where they were examining a silencer and hand grenade. The weapons they had on their persons at the time and that they sought to purchase that day were to further the conspiracy to murder.

Cox wore the body armor not only on March 10, 2011, but also when he went to Alaska State Trooper R.W.'s home, and while he went to the Bradway Road shed with Barney to move his weapons from the shed to Barney's property on February 21, 2011[7]. The weapons they moved from the Bradway Road shed were weapons to further the conspiracy to murder. In addition, Barney and Vernon wore body armor during the KJNP security detail on November 23, 2010. Barney and Vernon wore the body armor during the 11/23/10 security detail where they expected law enforcement to show up and had detailed plans for how to engage in force and fire with law enforcement, as directed by Cox. After the warrant was

---

[7] There was testimony at trial that Cox always wore his body armor whenever he left Barney's house after he moved in on February 19, 2011.

U.S. v. Cox                                        35
3:11-cr-00022-RJB

issued for Cox on 2/14/11, Cox and Barney expected that law enforcement would come to arrest Cox. Then, when he knew he was going to go to an illegal weapons deal, he wore the body armor. He wore it for protection from gunfire not only from law enforcement but also from Bill Fulton and Aaron Bennett based on Barney's and Cox's stated beliefs that Bill Fulton and Aaron Bennett were dangerous.

As set forth in Application Note 1, "use" means active employment in a manner to protect the person from gunfire. A 2-level enhancement applies where the offense involved the use of body armor, as in this situation where Vernon and Barney were wearing body armor during the November 23, 2010 security detail. But here a 4-level enhancement is warranted instead of a 2-level enhancement because the defendant himself was wearing the body armor on March 10, 2011 and other occasions. *See United States v. Haynes*, 582 F.3d 686, 711 (7th Cir. 2009) (subsection (A) applies "when the offense involved use of body armor, for example, when a codefendant used body armor"; subsection (B) applies "when the defendant himself used body armor"). Because Cox himself used the body armor during the commission of and in preparation for the conspiracy to murder, a 4-level enhancement is warranted.

In *Haynes*, the defendant objected to application of the enhancement because he claimed that he wore body armor to make their targets believe they were

Case 3:11-cr-00022-RJB    Document 550    Filed 01/02/13    Page 36 of 66

legitimate police officers engaged in legitimate law enforcement. The Seventh

Circuit rejected the defendant's argument. The court upheld the district court's

application of the 4-level enhancement: "The court drew the reasonable inference

that the body armor was being used for its primary purpose – for protection. The

fact that the body armor may also have been used to identify the defendant officers

as legitimate Chicago cops engaged in lawful police activity doesn't make the

enhancement inappropriate." *Id*. at 712. *See also United States v. Barrett*, 522

F.3d 724, 728 (8th Cir. 2009) ("The ability of body armor to serve dual purposes

does not make 3B1.5 inapplicable where the facts show one purpose could be to

protect the wearer from gunfire").

In *Barrett*, the defendant claimed that he simply wore a bulletproof vest

while attending a party with his friends. 522 F.3d at 727. The court concluded that

the enhancement applied because the defendant wore the vest while distributing

meth to his friends and while threatening his "friends" with a gun, and because the

vest provided personal security when he shot one of his friends: the defendant's

"'fashion statement' did double duty as a protective shield in case others also

carried firearms and were equally disposed to use them." *Id*. at 727-28. The court

held that the vest served its intended purpose even though shots were not fired at

the defendant. *Id*.

Case 3:11-cr-00022-RJB    Document 550    Filed 01/02/13    Page 37 of 66

In an unpublished decision, the Tenth Circuit Court of Appeals pointed out that this guideline enhancement does not require that the body armor be used in connection with the drug trafficking offense (or crime of violence) and upheld the application of the enhancement. *United States v. Chambers*, 2008 WL 622807, *4 (10th Cir. 2008). Here, Cox's main purpose for wearing body armor after 2/14/11 was for protection from gunfire. Thus, the 4-level enhancement applies.

### E.    Adjustment for Obstruction of Justice: U.S.S.G. § 3C1.1

The PSR correctly found that the defendant is subject to a two-level adjustment for obstruction of justice, as a result of Cox's perjurious testimony at trial. PSR ¶¶ 125, 145. In his objections to the draft PSR, Cox objected to this adjustment, however given Cox's trial testimony, application of this adjustment is clearly appropriate.

Here, the Court, who had the best position possible to view Cox's outlandish version of events, had a front row seat to Cox's clear attempts to manipulate the jury, observed and heard his continued blame shifting, denial of responsibility and the falsehoods he elected to tell again and again. There are numerous examples of Cox's false testimony on material matters at trial. Cox's false testimony was necessarily rejected when the jury convicted Cox of Counts 1, 2, 3, 4, 5, 6, 10, 12 and 16. Below are some examples of Cox's willful false testimony:

Case 3:11-cr-00022-RJB    Document 550    Filed 01/02/13    Page 38 of 66

1. Cox's testimony regarding names on the list found at Anderson's residence and Anderson's role in the conspiracy was as follows:

   a. that he did not tell Anderson to put those names down (6/5/12, pg. 50),

   b. that he did not tell anyone to put together a target list (6/5/12, pg. 51),

   c. that he didn't tell Anderson to create a list (6/5/12, pg. 106-07),

   d. that he wanted to build relationships with law enforcement (6/5/12, pg. 106-07),

   e. that he never had a TSA employee on a hit list (6/5/12, pg. 49),

   f. that he never formed a plan to kill T.S. or T.B. (6/5/12, pg. 49-50),

   g. that he didn't give the names of W.W. or N.C. to Anderson (6/5/12, pg. 126; 6/6/12 p. 114; 6/6/12, pg. 77, 79, 82),

   h. that he didn't know where the names on the list came from (6/6/12, pg. 114),

   i. that he didn't make any plans to attack government employees (6/5/12, pg. 92),

   j. that he didn't want to kill anybody (6/5/12, pg. 126),

   k. that he never asked Anderson to do surveillance (6/5/12, pg. 56),

U.S. v. Cox
3:11-cr-00022-RJB

39

l. that he just wanted to see Anderson because Cox was leaving (not to get the list) (6/5/12, pg. 112),

m. that he didn't have any interest in the list and didn't ask Anderson for the list (6/6/12 pg. 113),

n. that the reference to "hit list" found on his iPhone refers to songs they were going to record on an album and call it Hit List (6/5/12, pg. 117-19)

o. that he didn't give names to Anderson (6/6/12, pg. 70)

p. that he didn't ask Anderson to find out where W.W. lived, or to do surveillance, and that he didn't say she might get a bullet through her windshield (6/6/12, pg. 75)

q. that he didn't ask Anderson to look for federal marshals (6/6/12, pg. 77)

2. Cox testimony regarding Alaska State Troopers' home addresses was as follows:

a. that he wanted Trooper B.B.'s home address to go visit him about the OCS matter and get his help (6/5/12, pg. 51-52),

b. that he considers a social change agent establishing friendly relationships with local law enforcement, such as by going to troopers' homes (6/4/12, pg. 168-169),

U.S. v. Cox                             40
3:11-cr-00022-RJB

    c. that he went to Trooper R.W.'s house because he wanted his help

        and warned Trooper R.W. about Bill Fulton (6/5/12, pg. 18;

        6/6/12, pg. 112),

    d. that he didn't do surveillance of Trooper R.W.'s house (6/5/12, pg.

        56),

    e. that he only talked to Anderson once about Trooper B.B.'s and

        Trooper R.W.'s address (6/6/12, pg. 142)

    f. that he did not threaten Trooper R.W. (6/6/12, pg. 48-49)

    g. that the only reason he had Trooper M.J.'s personal information

        was to know which jail to go to bail out his friend (6/6/12, pg. 71-

        72) (despite recorded conversation where Cox said, here's the guy

        we've been having problems with)

3. Cox's testimony regarding internet searches he did on Barney's computer

   was that he was only looking for pictures, not planning to murder,

   Trooper B.B, Judge M.M., and DA A.S.  6/5/12, pg. 147.  But Exhibit

   779 is a google map search for Judge M.M. (not an image search).

4. Cox's testimony regarding 2-4-1:

    a. That Olson relayed the 2-4-1 plan to Cox on 2/6/11 and Cox's

        response was that's not good, that nothing would come from that

        (6/5/12, pg. 74-76)

U.S. v. Cox

3:11-cr-00022-RJB

b. That Olson asked Cox to bring up 2-4-1 at the 2/12 meeting (6/5/12, pg. 94)

c. That on 2/19, Olson kept pushing for 2-4-1 and Cox kept saying no, we can't do that (6/5/12, pg. 102)

d. That he was talking Olson out of 2-4-1 and condemning the idea (6/6/12, pg. 110)

e. That 2-4-1 was Olson's idea, but came from Fulton (6/6/12, pg. 106-07)

f. That he talked about 2-4-1 because the best way to identify bad ideas is to talk about them (6/6/12, pg. 147)

g. That 2-4-1 was a bad idea (6/6/12, pg. 148)

h. That everyone was against Olson on 2-4-1 (6/6/12, pg. 149)

i. That he condemned the plan to kill public officials (6/6/12, pg. 150)

5. Cox's testimony regarding Fulton:

a. That he sent people out for the armed security detail at KJNP on November 23, 2010 because he "was instilled with a very real fear that if I kept trying to pull a Gandhi, [Fulton] would kill me" (6/5/12, pg. 44)

U.S. v. Cox                                             42
3:11-cr-00022-RJB

b. That he wore body armor 24/7 because he was afraid of Fulton (6/5/12, pg. 47)

c. That he didn't want to see Fulton at the militia summit (6/5/12, pg. 60)

d. That Fulton wanted to kick off a fight and use Cox's state court case as a catalyst and reason to kick off the fight (6/5/12, pg. 74-76; 6/6/12, pg. 147)

e. That when Cox appeared in front of Judge J.K. and told her about people who would rather kill her, that he was referring to Fulton and warning the judge about Fulton (6/5/12, pg. 84; 6/6/12, pg. 110)

f. That Fulton was going to kill Cox if Cox didn't get on board with Fulton's plans to go kill judges (6/5/12, pg. 84)

g. That he wasn't going to appear for his 2/14/11 hearing because he was convinced that Fulton was going to slit his throat (6/5/12, pg. 90)

h. That he told the other militia members not to risk showing up at court with Fulton "out there" (6/5/12, pg. 95)

U.S. v. Cox
3:11-cr-00022-RJB

43

i.  That he had a moral obligation not to go to court because that's going to set Fulton off and Fulton's going to hurt people (6/5/12, pg. 98)

j.  That he didn't show up for the 2/14 court hearing because he thought Fulton was going to kill other people (6/6/12, pg. 115)

k.  That he called Trooper R.W. and told him to look out for Fulton (6/6/12, pg. 115)

l.  That his plan was to leave and find a place where Fulton and the feds wouldn't bother him  (6/5/12 pg. 146)

m. That he continued to interact with Fulton because he had a duty to try to influence Fulton (6/6/12, pg. 135)

n.  That for KJNP he gave directions not to shoot unless life is in danger, such as if Fulton jumps out and starts blazing away (6/5/12, pg. 196)

o.  That he fled to prevent Fulton from killing local law enforcement (6/5/12, pg. 199)

p.  That his concern at KJNP was that Fulton was going to kill him (6/5/12, pg. 204)

q.  That he was carrying a firearm the night of KJNP in violation of his pretrial conditions, but he was more scared of Fulton than he

U.S. v. Cox                                    44
3:11-cr-00022-RJB

was of violating his conditions and didn't want to follow those orders if it meant not being able to shoot back if he had a run-in with Fulton (6/5/12, pg. 210)

    r.  That he told Trooper R.L., Trooper R.W., and AUSA S.C. about his meeting with Fulton in June 2010, told them he was afraid of Fulton, and told them that they needed to be afraid of Fulton (6/6/12, pg. 7-8)

6.  Cox's testimony regarding 3/10/11 transaction:

    a.  That he thought the 3/10 meeting was to meet the trucker, that he didn't learn that the other items Fulton was selling would be part of the meeting until he got into Olson's truck (6/5/12, pg. 128-29)

    b.  That he put gloves on in the truck because he didn't want fingerprints on anything that's going to be in possession of Fulton (6/5/12, pg. 131)

    c.  That he thought the purchase from Fulton was going to be legal (6/6/12 pg. 114)

    d.  That the silencers were represented as legal (6/6/12, pg. 152; 6/6/12, pgs. 98, 104)

    e.  That upon his arrest, he said he could help stop Fulton (6/6/12 pg. 136)

7. Cox's testimony regarding grenades:

  a. That he had grenade bodies just because they're cool (6/5/12, pg. 10-11) and wanted them for fun (6/6/12, pg. 114)

  b. That he was looking for pineapple grenades because he thought a grenade toss would be a fun activity with training fuses (6/5/12, pg. 66)

  c. That he didn't arrange to get grenades from Olson on 3/1/11 (6/5/12, pg. 123-24)

  d. That he never made arrangements to have real grenades (6/5/12, pg. 123-24)

  e. That he didn't really want 8 second fuses and powder that burns (like he said on the recording), that he was not going to make explosives, and that was just macho talk (6/6/12, pg. 83-84)

  f. That he was just using grenades for fun (6/6/12, pg. 85)

  g. That the JB weld in the trailer was not with the grenade bodies (6/6/12, pg. 86)

  h. That he never agreed to buy grenades, never ordered real grenades, never told Olson that he wanted those grenades (6/6/12, pg. 97-98, 102)

  i. That he wasn't interested in the grenades (6/6/12, pg. 105-06)

8. Cox's testimony regarding 37mm launchers:

   a. That he had them for his tree business, for sailing, and golf (6/5/12, pg. 110-12)

9. Cox's testimony regarding the silencer was as follows:

   a. That he just built it because it was cool (6/5/12, pg. 10-11)

   b. That the silencer was for foxes getting in his chicken shed (6/6/12, pg. 138)

   c. That the silencer dvd found in his home wouldn't work for him (6/5/12, pg. 10-11; 6/6/12, pg. 112; 6/6/12, pg. 92)

   d. That the other dvds found in his home (conversion manuals) must have been given to him or belonged to people living in the house after they moved out and he didn't go through them (6/6/12, pg. 113; 6/6/12, pg. 94)

10. Cox's testimony regarding the Sten machinegun was as follows:

   a. That he made the Sten himself, including the parts, starting when he was 16 years old (6/5/12, pg. 8-10)

   b. That the Sten didn't work for him, it was just made for display (6/5/12, pg. 8-10; 6/6/12, pg. 112; 6/6/12, pg. 65; 6/6/12, pg. 76)

c. That based on a conversation with an ATF agent, he thought it was okay to have his unregistered silencer and machinegun (6/6/12, pg. 136-37)

d. That neither the machinegun nor the silencer were going to be used to kill people (6/6/12, pg. 139)

e. That he didn't own any weapons that were illegal (6/6/12, pg. 83)

11. Cox's testimony was that he had a police duty belt because it's a good holster for a Glock (6/5/12, pg. 8)

12. Cox's testimony was that the militia's a good thing to have around every spring when the ice dams up the Tanana and floods the Salcha (6/4/12, pg. 171)

13. Cox's testimony was that he did not represent himself to be an attorney when he was on the phone with Trooper M.J. (6/5/12, pg. 58)

14. Cox's testimony was that he did not threaten Trooper T.S., that he told Trooper T.S., referring to the people versus the government, that we've got you outmanned and outgunned, and we could probably have everybody dead in – in one night. But what would – what good would that do? 6/5/12, pg. 88. The recording of that interaction reflects that Cox told Trooper T.S., "We've got you guys out-manned and outgunned, and we could probably have *you guys* all dead in one night" (emphasis

added).  Cox's addition of "what good would that do" is not heard on the

recording.  Ex. 927.

15. Cox's testimony was that the only time he would use a weapon on

somebody was if he absolutely had to and there was no other possible

option to avoid conflict (6/6/12, pg. 69)

16. Cox's testimony was that handcuffs were just a cool addition to ranger

uniforms (6/6/12, pg. 69)

Cox's false testimony contradicted virtually all of the physical evidence

introduced against him.  In that respect Cox lied to the jury with respect to the

following:

-As to his homemade silencer, "he didn't know the law."

-As to the list, "it was Mike Anderson's idea."

-The silencer DVD would not work on Cox's laptop

-The Sten did not fire fully automatic for him, along with he was misled by

ATF and the FBI rigged the test enabling it fire in full automatic.  Cox's own

statements about the Sten, where he admitted to it being fully automatic, contradict

this claim, as does Anderson's testimony.

-The JB Weld was not located where investigators said it was located in

Barney's trailer.

Case 3:11-cr-00022-RJB    Document 550    Filed 01/02/13    Page 49 of 66

- The CDs with the full auto conversion manuals, silencer instructions and explosive destructions were not his, but were "somebody else's spam" left in his home.

-The internet searches for ammonium nitrate bombs were "for fun."

-The silencer/grenade deal on March 10, 2011 was Olson's fault.

-He didn't know what a Hornet's Nest was.

-241 was blamed first on Olson, and then Cox added to it saying the idea came from Bill Fulton.[8]

Cox's testimony was clearly over the threshold necessary for a finding of perjury. Here, there is no innocent mistake or accident, but a clear attempt at manipulating the jury and this Court.

"The commission of perjury is of obvious relevance [to the extent of punishment], because it reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her character in general." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* "Material" testimony is that which "if believed, would tend to

_____

[8] It is clear from his testimony at trial that Cox is simply incapable of telling the truth and his lies were calculatingly telling as they were directed toward specific elements of the crimes which, if believed, may have exonerated them. In several respects, his lying is sociopathic.

Case 3:11-cr-00022-RJB    Document 550    Filed 01/02/13    Page 50 of 66

influence or affect the issue under determination."  U.S.S.G. § 3C1.1, Application

Note 6.  An obstruction enhancement is mandatory once a proper supporting

factual finding is made.  *United States v. Luca,* 183 F.3d 1018, 1023 (9th Cir.

1999); *United States v. Ancheta*, 38 F.3d 1114, 1117-18 (9th Cir. 1994).  False

testimony before the court can provide a basis for an obstruction enhancement.

*See United States v. Sherwood*, 98 F.3d 402, 415 (9th Cir. 1996) (upholding 3C1.1.

enhancement based on suppression hearing testimony).  Cox, like Barney, provided

false affidavits with the court, and while they can be used as a basis for

obstruction, *see United States v. Hernandez-Ramirez,* 254 F.3d 841, 843-44 (9th

Cir. 2001) (upholding 3C1.1 enhancement based on false financial affidavit);

*United States v. Tidwell*, 191 F.3d 976, 982 (9th Cir. 1999) (upholding 3C1.1

enhancement where defendant "willfully created affidavits with the expectation

that they would mislead the court");  *see also United States v. Munoz*, 101 Fed.

Appx. 216, 217 (9th Cir. 2004) (upholding 3C1.1 enhancement where "in a sworn

affidavit submitted in connection with a motion to suppress, [defendant] committed

perjury pertaining to alleged threats made to her by an investigating officer"),

Cox's trial testimony was a clear, transparent and blatant attempt to perjure himself

in the hopes of an acquittal.  Clearly, the jury saw through this attempt, convicting

Cox of every charge save for the 924(c) charges concerning the carrying of

firearms.

Case 3:11-cr-00022-RJB     Document 550     Filed 01/02/13     Page 51 of 66

### F. Acceptance of Responsibility

The PSR correctly found that the defendant is not entitled to a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. PSR ¶ 152. Cox claimed "partial acceptance of responsibility" in his objections to the draft pre-sentence report regarding PSR ¶ 127, claiming possession of the Sten machine gun, the silencer, and the grenade launchers and Hornet's Nest cartridges and responsibility for same. It is not clear whether Cox maintains this objection regarding no reduction for acceptance of responsibility as to Counts 12 and 16 in PSR ¶ 152. Cox's actions with others, during trial and in opposing the facts of the presentence report, combined with his continued claims of innocence, establish that Cox has not demonstrated acceptance of responsibility for the offenses.

It should be clear to this Court that it has before it a manipulative, conning and self-aggrandizing individual with severe sociopathic tendencies. Cox lies easily, and often, and while on the stand wove as a defense a fanciful tale (which the jury ignored and was thoroughly discredited by his own words and actions) about a vast government conspiracy composed of a hit team, government informants and others. When confronted with evidence found in his home, Cox denied knowledge of the existence of the items or that they would not work. He blamed unknown other individuals for leaving CDs full of files ranging from fully automatic weapons conversions manuals to the how to pick locks. A CD on

U.S. v. Cox                                    52
3:11-cr-00022-RJB

making homemade silencers "wouldn't work on his laptop." The grenades and silencers were Olson's fault. The Sten machine gun would not fire fully automatic for him, and if it did, he was misled by ATF. The list was Mike Anderson's idea. He didn't know the law about possessing silencers.

Cox's lies to Agent Sutherland, some of which were played at trial, and testified to by him at trial are just as revealing.

- The domestic violence charges were an attempt at character assassination

- "Cans and Produce" were references to dried food

- He was not aware what a Hornets Nest and stingball was

- He didn't recall asking Vernon and Olson to get "pineapples"

- He would only be speculating as to where he left Barney's trailer that morning

- He denied knowing where "anyone lived" except his friends

- He wouldn't possess explosive devices because he was afraid of them and never planned to possess grenades

- His twitter account was a general communication tool and not for a specific purpose

- He had not been in contact with Mike Anderson for a long time

- He did not agree to barter the C-93 and the full auto lower trigger group to Olson for a silenced pistol

U.S. v. Cox                                        53
3:11-cr-00022-RJB

- He only wanted a silenced pistol because it was cool

- Seeing Mike Anderson on March 7, 2011 was not about getting the list

Cox's trial testimony in the face of the evidence against him vastly outweighs any conceivable benefit he seeks, and, as argued and shown here, amounts to obstruction of justice.   His plea to the jury, upon conviction, "but they held evidence from you" illustrates the depth of his denial.  As set forth in his objections to the PSR, Cox continues to deny that he directed Anderson to add T.B. to the list, or that he made threats regarding T.B. and W.W.  Cox's denials in his objections squarely contradict testimony of numerous witnesses at trial, and recordings and physical evidence introduced at trial.  In addition, Cox sent a letter from jail during the summer of 2012 alleging that the government "manufactured a case against him" and that the "criminal charges that were brought by man are lies." Exhibit A (Cox letter, together with Fairbanks Daily News Miner article).  It is obvious that Cox continues to refuse to accept responsibility.  The Final Presentence Report is correct in not awarding Cox a two-point reduction for acceptance of responsibility.

### G.   Criminal History Category Computation

There is no dispute that Cox's criminal history category is Category II.

## IV.    APPLICATION OF 18 U.S.C. § 3553(a)

In addition to the Guidelines, the following sentencing factors set forth in 18 U.S.C. § 3553(a) apply: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, afford deterrence, protect the public from further crimes and provide the defendant training and treatment; (3) the kinds of sentences available; (4) the established Guidelines sentencing ranges; (5) any pertinent Guidelines policy statements; (6) the need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes; and (7) the need to provide restitution to victims of the offense.  18 U.S.C. § 3553(a)(1) through (7).  Each sentencing factor is addressed in turn:

### A.    <u>Nature and Circumstances of Offense and the History and Characteristics of the Defendant.</u>

#### 1.    History and Characteristics of the Defendant

Cox's history and background are characterized by a correspondence school education, a scattered work history primarily circulating around self-employment in outside home repair, landscape or labor trades.  It is of no real surprise, given the investigation, that Cox's scholastic and professional path were those of his own choosing.  Up until his arrest, Cox chose to increasingly ignore, disregard and thwart the state's legal system, again, through his own choices, by failing to appear

for his misdemeanor weapons charge, or, by claiming that the assault charges filed against him were part of a character assassination scheme orchestrated by the government.

It is abundantly clear that Cox views himself above the law and that he lives by his own set of rules which he expects others to abide by. His conduct with members of the militia is controlling, his speeches self-aggrandizing. He fails to accept responsibility for anything or any of his actions, from weapons possession to striking and choking his spouse. His testimony at trial was utterly perjurious, primarily because there is no history of Schaeffer Cox ever accepting responsibility for his own actions.

### 2. The Instant Offense(s)

The facts of the instant offense are well known to the Court through the trial of this case and Cox's own testimony. The offenses involved the following serious charges:

• Conspiracy to Murder Federal Officials

• Solicitation to Commit a Crime of Violence (Murder)

• Conspiracy to Possess Silencers and Hand Grenades (Unregistered)

• Possession of a Machine Gun and a Silencer (Unregistered)

• Possession of Hand Grenades (Unregistered Destructive Devices)

**B.** **Need for the Sentence to Reflect the Seriousness of the Offense, Afford Deterrence, Protect the Public, and Rehabilitate the Defendant.**

The sentence must reflect the seriousness of the offense, promote general respect for the law, and provide just punishment. In addition, the sentence must be sufficient to adequately deter criminal conduct, both for the defendant and the general community.

Cox promoted himself as the leader of a militia, a leader of the Second Amendment Task Force and the de facto leader of the so-called "Liberty Bell Network." He also organized and promoted flyers challenging the legitimacy of the Alaska Court system and the Alaska Bar Association, claiming both entities were under "criminal investigation." He urged those interested to attend his meetings to "overturn" judgments and recover compensation. Each of his entities, taken alone, was directed to or toward supplanting or challenging government. Taken together, they formed a political movement with Cox as the indisputable leader. He would have it no other way.

The crimes of conspiracy to commit murder, solicitation to commit crimes of violence (murder) and the weapons offenses proven by the government are significant, serious and a danger to the public. Cox and his associates possessed a veritable arsenal of tactical firearms and ammunition, including body armor and tactical scopes for their assault rifles, they made attempts at training, and amassed

U.S. v. Cox
3:11-cr-00022-RJB

57

enough OC and CS gas in the form of grenade-type or grenade launcher rounds to incapacitate a small police force, more than 40 rounds of the stuff. Why so much gas was purchased was something that the investigation never revealed.

What it did reveal though was Cox's willingness to urge his men to use it, being so bold and unconcerned with the public that he, for his own narcissistic reasons, organized heavily armed, body armor attired "security details" to protect him. But for bad weather, one of these details would have appeared in downtown Fairbanks with instructions to kill "plain clothes" agents. At KJNP, the security detail did manifest itself, with at least five members, all armed with tactical weapons, and with at a minimum Barney and Vernon wearing body armor. Cox's inability, and indeed continued inability to see the danger to the public of his actions speaks volumes as to his understanding or concerns about his actions.

The same holds true for the convictions on Counts 12 and 16. Cox professes absolute innocence with respect to these charges. The evidence however is overwhelming with respect to Cox's expressed intentions to kill. Like most sociopathic personalities, Cox attempts to distinguish his actions by blame shifting, qualifications or other guilt-avoidance mechanisms. The fact remains that a jury found him guilty beyond a reasonable doubt of these extremely serious acts which were part and parcel of Cox's political movement against the government, both state and federal. For Cox to take such steps speaks volumes as to his lack of

empathy for the public or concern, to have a heavily armed, untrained group of men open fire in a public area for his own protection (whether in downtown Fairbanks or at KJNP). It is just another manifestation of Cox holding his own sense of self-importance higher than that of the public or law enforcement. The irony is Cox could have avoided the entire spectacle and kept his men and the public safe by doing one simple thing: staying home. Once again, his ego and his story got in the way. Compiling personal information about government employees, combined with his arsenal of weapons and his own recorded words about killing, demonstrate the extreme danger Cox was to the public.

As to the final factor, the government's view is that Cox is beyond rehabilitation. The simple truth is he believes "man's law" is of no application to him. This type of belief, akin to a subscription to a particular religion or political belief, cannot be remedied.

Indeed, even after conviction, Cox sent "A Letter From Schaeffer." Exhibit A. In the letter, Cox calls the case against him "manufactured" and the federal government a "godless, corrupt federal government." He further states that, "I know these events are from the Lord–they are just too bizarre to be explained any other way." Finally, he asks, "Please pray that God bring out the truth in this case so that I can be reunited with my family quickly." These are not the words of a remorseful man.

U.S. v. Cox                     59
3:11-cr-00022-RJB

### C.  **Kinds of Sentences Available.**

Given the defendant's position on the sentencing guidelines scale, there are not other types of sentences available aside from significant imprisonment.  Cox's offense level is six levels higher than the highest level contemplated by the Sentencing Commission.  An offense level of 43 renders a Guideline range of life. Here, Cox's offense level of 49 also results in an advisory range of life imprisonment.

### D.  **Sentencing Ranges Available.**

The Guidelines are advisory, not mandatory, *United States v. Booker*, 543 U.S. 220 (2005), and the sentencing court may not simply presume that the Guideline range is reasonable.  *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Rita v. United States*, 551 U.S. 338, 351 (2007).  However, the sentencing court must still carefully and correctly calculate the Guideline range, and this "remains the starting point" for any sentencing determination.  *United States v. Ameline*, 409 F.3d 1073, 186 (9th Cir. 2005).

### E.  **Pertinent Policy Statements.**

There are two policy statements pertinent here: Weapons and Dangerous Instrumentalities under U.S.S.G. § 5K2.6 and Public Welfare under U.S.S.G. § 5K2.14.

Case 3:11-cr-00022-RJB     Document 550     Filed 01/02/13     Page 60 of 66

## F.    Need to Avoid Sentence Disparity.

The sentence sought takes into account the full range of offense conduct performed by Cox during the course of this investigation, case and trial.  Cox's co-conspirator, Coleman Barney, benefitted from a hung jury as to Count 12 and Barney was far less instrumental in terms of leadership as to these offenses. Barney's sentence of five years should be no bar to the Court's consideration of Cox's sentence, particularly given the different offenses of conviction.  Cox's other co-conspirator, Vernon, who faces sentencing the day before Cox, was in many ways on his own "track" with respect to his own actions.  Vernon was clearly a team player in Cox's militia, and was anxious to acquire additional weaponry for the militia.  He was, as seen by the evidence and his plea, just as keen and anxious to follow through with his plans to murder Chief Judge Beistline and members of his family.  Vernon is facing a binding sentencing range of 262-327 months, a range of 21 to 27 years.   His spouse and co-defendant in Case 28, Karen Vernon, is facing an advisory sentencing range of 188-235 months.  Both of these sentences, due to the defendants' ages, are essentially life sentences for both.

The government's recommendation of 35 years for Schaeffer Cox is based on the totality of the offense conduct, the history and characteristics of the defendant, together with the statutory maximum sentences for the offenses of conviction which provide for terms of life, twenty years, ten and five years,

U.S. v. Cox                                             61
3:11-cr-00022-RJB

respectively, for the counts of conviction. Cox's actions and his leadership role justify a significantly higher sentence than the Vernons' sentences. As leader of the Alaska "Peacemaker" Militia, among other titles, Cox could have taken his lumps in state court, accepted responsibility for his acts and urged peace. Cox could have gone "Gandhi" (as he testified about), but that was simply lip service to fill in the time up to when the militia amassed enough strength to murder. In the end, Cox could have simply told his men to go home to their families and their lives. That never happened. It was the one thought that never entered into his mind.

### G.  Fine, Restitution, Forfeiture.

While it appears that Cox does not have the ability to pay a fine, Cox possessed a significant amount of cash and precious metals of an unknown amount. Given his clear propensity to lie, his claims of poverty are likely overblown. Restitution is not an issue in this case. As to forfeiture, there is a non-opposed motion for forfeiture of the hand grenade parts, silencer attached to .22 Walther, Sten machine gun, and 37mm launcher and Hornet's Nest anti-personnel round at docket 462. This Court entered a Preliminary Order of Forfeiture at docket 468 and a Final Order of Forfeiture at docket 534.

### H.    Victim Impact.

The PSR includes two victim impact statements.  The letters provide the Court with real and personal information as to the impact Cox's actions had and continue to have both on officials targeted by Cox and their family members.  The sentence sought here will ensure that Cox will remain incarcerated for an extensive period of time, thus nullifying the threat he posed to the victims in this case.

## V.    CONCLUSION

The Court has before it a defendant who, after more than a month of trial, stands convicted of conspiracy to murder federal officials, solicitation of murder, conspiracy to possess unregistered silencers and destructive devices, and possession of unregistered silencer, machine gun, and hand grenades.  His guideline range for these offenses, along with a Criminal History Category of II, is half a dozen levels higher than the top level of the Guideline range, Level 43.  In order to simply attain a sentence of "life" at level 43, Cox will have to convince the Court to downward depart six levels.

The United States recognizes that a sentence of 35 years is a significant sentence.  It is no less significant than the crimes Cox stands convicted of committing. At sentencing, the Court will strive to strike a balance between rehabilitation and the safety of the public, among other things.  Schaeffer Cox is not, in the government's view, a candidate for rehabilitation.  Cox has shown this

U.S. v. Cox                                             63
3:11-cr-00022-RJB

Court his ability to lie and deceive for his agenda, and his ability to lead others through lies, deceit and misrepresentation. In the end, Cox would be happy for his troops to do his bidding, while he remained comfortably behind giving orders.

The Court also has before it a defendant whom the government's case has demonstrated is without remorse. Cox attempted to manipulate witnesses who testified against him (witness TB) and has manipulated others to his own ends. Cox is contemptuous of this state's and this country's legal system. He possesses a clear disrespect for all law and cares not for the individual rights of others when their rights clash with his own. Cox is of the belief that his actions transcend law.

Cox also speaks easily of planning to kill and the act of killing without hesitation, as a means justifying an end. Of his targets, he held no sympathy nor compassion, despite one being a long-time family friend. Of others, whom he didn't know, they were to be "hanged as wind chimes of liberty", "heads" were to be sent in boxes, or children killed as collateral damage. Any armament available, from hand grenades to machine guns and devices to silence them were in the offing. He directed and led the members of this conspiracy in the direction of killing, who to kill, and when the circumstances would be right. The killing was to be justified by political reasons, or as retribution simply because the targets were public servants doing their jobs as judges, clerks of court, state child welfare workers, Alaska State Troopers, U.S. Marshals, or other federal officers. It is clear

that a term of imprisonment will have no rehabilitative nor reformative effect on Cox. The crimes for which he stands convicted are as serious as they come, and the penalties just as harsh. While Cox is just shy of thirty years of age, his actions demonstrate a clear commitment to form his own style of government through the use of force, intimidation, and murder. He actively sought to recruit others in this cause and prosthelytized to others outside of Alaska that they should follow his model. He ultimately deviated from that cause and used the threat of his own private army to challenge and threaten law enforcement and the judiciary.

There is, understandably, a fine line between what is pure speech and what is actionable conduct. In this case, Cox leaped across that line in seeking explosives and unregistered weapons while conversationally and easily articulating an intent to kill while threatening law enforcement that they were "outmanned and outgunned and would be dead in one night," while soliciting others to kill for him. Because of this, Cox's own actions, and how he has elected to respond to them over the last several years has demonstrated that a lengthy sentence is the only way of protecting the public and its officials from a delusionally dangerous man who instead of advocating peace advocated the use of the gun.

Schaeffer Cox is a clear danger to society. A sentence of 35 years satisfies the statutory goals of sentencing, which at their core, provide for recognition of the

seriousness of the offense, and, just as importantly, provide for the protection of the public.

RESPECTFULLY SUBMITTED this 2nd day of January, 2013, in Anchorage, Alaska.

KAREN L. LOEFFLER
United States Attorney

s/ Steven E. Skrocki
STEVEN E. SKROCKI
Assistant U.S. Attorney
United States of America

s/ Yvonne Lamoureux
YVONNE LAMOUREUX
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on January 2, 2013, a copy of the foregoing was served electronically on:

Peter Camiel

s/ Steven E. Skrocki
Office of the U.S. Attorney